UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,                                            Case No. 23-cr-20395

v.                                                            HON. MARK A. GOLDSMITH

DEON GARRETT,

       Defendant.

_____/

**OPINION & ORDER
GRANTING DEFENDANT'S MOTION TO SUPPRESS (Dkt. 19)**

Before the Court is Defendant Deon Garrett's motion to suppress all tangible evidence gathered, and any statements made by Garrett, after officers seized and searched him at a bus station in Detroit, Michigan (Dkt. 19). The Court grants the motion for the reasons set forth below.[1]

**I. BACKGROUND**

Garrett is charged in this case with possession of fentanyl with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Indictment (Dkt. 1).

On March 21, 2023, Michigan State Police officers Kendall Hooper and Joshua Olszewski were stationed at a Greyhound bus station in Detroit, Michigan to identify passengers whom they suspected of transporting drugs. Gov't Suppl. Br. at 3; Resp. at 1–2. The officers observed Garrett

---

[1] In addition to the motion, the briefing includes the Government's response (Dkt. 21) and supplemental brief (Dkt. 29) and Garrett's supplemental brief (Dkt. 28). The Court held a hearing on the motion on March 11, 2024.

pull up to the station in a silver sport utility vehicle (SUV), exit the vehicle, and purchase a one-way ticket to Nashville, Tennessee under the name "corey garrett." Gov't Suppl. Br. at 3. Garrett then returned to the SUV and left the bus station. Id. at 3–4.

After obtaining Garrett's ticket information from a confidential source, officers discovered that the phone number associated with the ticket was Deon Maurice Garrett's number—not Corey Garrett's. Id.; 3/11/24 Hr'g Tr. at 12 (Dkt. 26). Garrett explained that Corey Garrett was his cousin. Gov't Suppl. Br. at 9. After matching Deon Garrett's Secretary of State photograph with the person they saw purchase the ticket, officers then reviewed Deon Garrett's criminal history and learned that he had previously been convicted of possession with intent to distribute controlled substances. Id. at 3–4.

About an hour after he purchased his ticket, Garrett returned to the bus terminal in the same SUV. Id. at 4. As Garrett headed towards his bus, officers approached Garrett, took Garrett's I.D. card and bus ticket, and began questioning him. Id. Garrett told officers that he was traveling to Nashville and denied possessing anything illegal. Id. After Olszewski asked if he could conduct a pat-down search, Garrett asked the officers if they had a warrant. Id. Olszewski poked at Garrett's jacket pocket, noted the "bulging pocket," and told Garrett that they were going to pat him down. Hooper Bodycam Video at 00:38–02:10 (Gov't Ex. 3). After attempting to place Garrett in handcuffs, Garrett momentarily ran away from the officers. Gov't Suppl. Br. at 4. The officers caught Garrett, placed him in handcuffs, and searched his pockets. Id. at 4–5. They found pills, which lab testing later revealed to be fentanyl. Id. at 5.

## II. ANALYSIS

"The Fourth Amendment prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of

2

traditional arrest." United States v. Arvizu, 534 U.S. 266, 273 (2002) (punctuation modified). Absent consent, an officer can stop and briefly detain a person—in what is known as a "Terry stop"—so long as there is "a reasonable suspicion supported by articulable facts that criminal activity may be afoot." United States v. McCallister, 39 F.4th 368, 373 (6th Cir. 2022) (punctuation modified). "To be considered a 'stop,' which is a form of 'seizure,' the police must use their authority to constrain a person's ability to leave." United States v. Vining, 675 F. Supp. 3d 778, 786 (E.D. Mich. 2023) (punctuation modified). If the "initial Terry stop was unlawful, and the evidence that resulted from the subsequent search . . . must be suppressed as the fruit of the 'poisonous tree' . . . unless it falls into an exception to fruits analysis such as the independent-source rule or inevitable-discovery doctrine." United States v. See, 574 F.3d 309, 314 (6th Cir. 2009) (punctuation modified).

Garrett moves to suppress evidence gathered from the search of his pockets and any statements after he was stopped and detained at the bus station. Mot. ¶¶ 5–6. He argues that officers subjected him to an illegal search and seizure in violation of the Fourth Amendment and that the evidence resulting from that search and seizure must be suppressed. Id.

The Government argues that the motion should be denied for three reasons: (i) Garrett's interaction with the officers was consensual and, therefore, there was no seizure for purposes of the Fourth Amendment; (ii) even if Garrett was not acting voluntarily, the officers' initial detention of Garrett was supported by reasonable suspicion; and (iii) by the time the officers conducted a pat-down search of Garrett, the officers had probable cause to arrest him. Gov't Suppl. Br. at 13–19.

The Court addresses each of the Government's arguments in turn. Because the Court finds that the officers did not have reasonable suspicion or probable cause to stop and search Garrett without his consent, the Court will grant Garrett's motion.

**A. Consent**

The parties contest whether the officers' initial encounter with Garrett—i.e., before officers attempted to handcuff him—was a seizure that triggered Garrett's Fourth Amendment protections. Garrett argues that a seizure occurred when he handed his ticket, I.D., and backpack to the officers. Def. Suppl. Br. at 6–7. The Government submits that there was no seizure because the encounter was voluntary until officers began to arrest him. Gov't Suppl. Br. at 12.

The Court finds that Garrett was seized for purposes of the Fourth Amendment by the time Olszewski began patting down Garrett's jacket pocket. And as discussed further below, the pat down constitutes an illegal search because officers lacked reasonable suspicion that Garrett was armed and dangerous.

"The test applied to determine if consent is free and voluntary is whether, in light of the totality of the circumstances, consent was given without coercion, express or implied." United States v. Woods-Gibby, No. 22-20370, 2023 WL 1965429, at *4 (E.D. Mich. Feb. 13, 2023) (punctuation modified). "Where the validity of a search rests on consent, the [Government] has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority. . . . The Government's burden to show consent is by a preponderance of the evidence and through clear and positive testimony." Id. (punctuation modified). "[W]ords alone may be enough to make a reasonable person feel that he would not be free to leave." United States v. Richardson, 385 F.3d 625, 629 (6th Cir. 2004).

4

Arguing that no seizure took place during Garrett's initial encounter with the officers, the Government relies on United States v. Drayton, 536 U.S. 194 (2002) to submit that "merely [] approaching" people on the street and "putting questions to them if they are willing to listen" does not violate the Fourth Amendment.  Gov't Suppl. Br. at 11–12.  In Drayton, officers boarded a Greyhound bus during a scheduled stop, declared that they were looking for drugs or weapons, and worked their way down the aisle addressing passengers.  Drayton, 536 U.S. at 199–200.  The defendant—a passenger on the bus—agreed to a pat-down search after being asked by one of the officers.  Id. at 199–200.  As the Supreme Court described the interaction in Drayton: "There was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice."  Id. at 204.  In other words, "[n]othing [the officer] said would suggest to a reasonable person that he or she was barred from leaving the bus or otherwise terminating the encounter."  Id.  Under these circumstances, the court held that the defendant was not seized and had voluntarily consented to the search.  Id.

The search at issue here bears little resemblance to the search in Drayton.  Video from the officers' bodycam shows Olszewski and Hooper quickly approach and stop Garrett before he boarded the bus, request Garrett's ticket and I.D., and question him about his travel plans and criminal history—all without providing any indication to Garrett that he was free to leave.  Hooper Bodycam Video at 00:38–01:20.  Even accepting the Government's position that Garrett had consented to talking with the officers by "engag[ing] in a friendly dialogue," Gov't Suppl. Br. at 12, the interaction turned involuntary the moment Garrett declined to submit to a pat down search from Olszewski.  As shown in the video recording of the interaction, Olszewski asked Garrett for his consent to a pat-down search.  Garrett responded by asking if the officers had a warrant and

5

ultimately refused consent to the search. Olszewski Bodycam Video at 01:06–1:35 (Gov't Ex. 2). Despite Garrett's refusal to submit to a search, Olszewski continued to poke at Garrett's pocket and officers attempted to physically restrain him. Id. Nothing about the interaction at that point was voluntary or consensual.

### B. Reasonable Suspicion

Because the Court concludes that Garrett did not consent to being stopped and searched, it must next address whether the encounter was a valid Terry stop and frisk supported by reasonable suspicion. The Court finds that the officers had neither reasonable suspicion of criminal activity to justify a Terry stop, nor reasonable suspicion that Garrett was armed and dangerous to justify a Terry frisk of Garrett's pocket.

In determining whether a particular stop is supported by reasonable suspicion, a court "must look at the totality of the circumstances of the case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." United States v. Pearce, 531 F.3d 374, 380 (6th Cir. 2008) (punctuation modified). An "officer must be able to articulate more than an inchoate and unparticularized suspicion or 'hunch' of criminal activity" to justify an investigatory stop. Illinois v. Wardlow, 528 U.S. 119, 123–124 (2000). Instead, the officer must be "able to articulate some minimal level of objective justification for making the stop," United States v. Waldon, 206 F.3d 597, 604 (6th Cir. 2000), based upon "specific reasonable inferences which [the officer] is entitled to draw from the facts in light of [his or her] experience." Terry, 392 U.S. at 27. Thus, reasonable suspicion requires more than a mere hunch, but it is "satisfied by a likelihood of criminal activity less than probable cause and falls considerably short of satisfying a preponderance of the evidence standard." United States v. Campbell, 549 F.3d 364, 370 (6th Cir. 2008) (punctuation modified).

The Government submits that Olszewski had reasonable suspicion to stop Garrett because (i) Garrett was driving a rental vehicle, (ii) Garrett purchased the bus ticket in cash, (iii) the purchased ticket listed "Corey Garrett"—and not Deon Garrett—as the purchaser, and (iv) Garrett had a criminal history of narcotics convictions. See Gov't Suppl. Br. at 14.

The Government fails to articulate, however, why these facts provided the officers with reasonable suspicion that criminal activity was afoot. There is nothing suspicious about driving a rental vehicle or paying in cash for a bus ticket. Although the first name associated with the ticket did not match Garrett's, this lone discrepancy is hardly indicative of criminal behavior. See, e.g., United States v. Richardson, 385 F.3d 625, 631 (6th Cir. 2004) (concluding that defendants' "conflicting explanations of their travel plans" did not give rise to reasonable suspicion and recognizing "innocent and plausible explanations for this behavior"); United States v. Townsend, 305 F.3d 537, 545 (6th Cir. 2002) (finding that the fact that defendant was stopped while driving his mother's car and with multiple cell phones in the passenger compartment was "weak" evidence of suspicious behavior). And Hooper's awareness of Garrett's criminal history alone does not give rise to reasonable suspicion that criminal activity was afoot. Joshua v. DeWitt, 341 F.3d 430, 446 (6th Cir. 2003) (explaining that defendant's criminal history, coupled with defendant's "nervousness, unarticulated furtive gestures, and 'illogical' travel route" does not give rise to reasonable suspicion). Tellingly, the Government cites no cases holding that such facts give rise to reasonable suspicion. Gov't Suppl. Br. at 13–15. Given the scant evidence of suspicious behavior cited by the Government, the Court finds that officers Olszewski and Hooper did not have reasonable suspicion to justify Garrett's detention.

Even if the Court were to accept the Government's position that Garrett's detention was supported by reasonable suspicion, the Government must still show that the pat-down search of Garrett was lawful. The Government fails to make such a showing.

"When an officer makes a Terry stop, he [or she] may also perform a precautionary search—known as a 'frisk' or 'pat down'—whenever he has reasonable suspicion that the person searched may be armed and dangerous." United States v. Pacheco, 841 F.3d 384, 390 (6th Cir. 2016) (punctuation modified). Here, the Government makes no argument that Olszewski's pat down of Garrett was justified by a reasonable suspicion that Garrett was armed and dangerous. Absent reasonable suspicion that Garrett was armed and dangerous, officers were not justified in conducting a pat-down search.

C. Probable Cause

The Government also submits that it had probable cause to arrest Garrett "by the time Officer Olszewski saw the bulge in Garrett's pocket,"—i.e., when officers began restraining Garrett just before he attempted to run. Gov't Suppl. Br. at 15. Again, the Court disagrees with the Government.

Arrests are reasonable if supported by probable cause that a crime has been committed; by contrast, investigatory stops are reasonable if supported by mere reasonable suspicion that crime is afoot. United States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999). "Probable cause exists where the facts and circumstances are sufficient to warrant a prudent person in believing that the suspect has committed, is committing, or is about to commit an offense. It is a practical and common-sensical standard based on the totality of the circumstances. Even though probable cause requires more than a reasonable suspicion of criminal activity, it is not a high bar." United States v. Hutchins, No. 22-3655, 2023 WL 7489987, at *4 (6th Cir. Nov. 13, 2023) (punctuation modified).

8

Attempting to show that the officers had probable cause to arrest, the Government stands largely on the same facts that it asserts supported reasonable suspicion to perform the Terry stop. Specifically, it argues that the officers' earlier investigation—i.e., Garrett's criminal history and mismatched ticket—coupled with Garrett's refusal to submit to a pat-down search and Olszewski's belief that the bulge in Garrett's pocket "was likely drugs," supplied the officers with probable cause to arrest Garrett. Gov't Suppl. Br. at 19–20.

These facts are insufficient to support a finding of probable cause. Garrett's refusal to submit to the search is "irrelevant to the probable-cause analysis" because "the exercise of a constitutional right, whether to refuse to consent to a search, to refuse to waive Miranda rights or to decline to testify at trial, is not evidence of guilt." United States v. Waide, 60 F.4th 327, 338 (6th Cir. 2023) (holding that defendant's refusal to provide law enforcement access to DVR equipment was not relevant to probable-cause determination). The same is true of Olszewski's belief that the bulge in Garrett's pocket was drugs. Olszewski testified that his belief derived from "pinching [the pocket] between [Olszewski's] fingers." 3/11/24 Hr'g Tr. at 76. But as discussed above, Garrett did not consent to that pat-down search, nor did Olszewski have a legal basis to perform such a search. Thus, Olszewski's belief that the bulge in Garrett's pocket was "either pills or crack cocaine" cannot inform the probable-cause analysis.

Setting aside Garrett's refusal to be searched and what Olszewski believed to be in Garrett's jacket pocket, the Government's case for probable cause amounts to Garrett's criminal history, use of a rental vehicle, and a mismatched name on a bus ticket. For the same reasons as those described above, these facts are insufficient to support a finding that officers Hooper and Olszewski had probable cause to arrest Garrett for some drug offense.

9

Garrett did not consent to being seized or searched. The officers had neither reasonable suspicion to temporarily detain and pat-down Garrett, nor probable cause to arrest him. The tangible evidence collected, as well as any statements made by Garrett after the officers began to pat down Garrett's jacket, must be suppressed.[2]

### III. CONCLUSION

For the reasons stated above, the Court grants the motion to suppress (Dkt. 19).

SO ORDERED.

Dated: August 29, 2024　　　　　　　　　　　s/Mark A. Goldsmith
　　　　Detroit, Michigan　　　　　　　　　　MARK A. GOLDSMITH
　　　　　　　　　　　　　　　　　　　　　　United States District Judge

---

[2] Garrett does not specify the statements that he wants suppressed. See Def. Mot.; Def. Suppl. Br. Nor does the Government argue that certain statements should not be suppressed. See Gov't Resp.; Gov't Suppl. Br. Because the Court finds that Garrett was seized by the time of the pat-down search, any statements Garrett made after that time must be suppressed as fruits of an illegal search.